[Civ. No. 11929.   Second Appellate District, Division Two.—September 27, 1938.]

CLYDE McMURRAY, Appellant, v. AIMEE CHRISTINE SIVERTSEN et al., Respondents.

542

Walter W. Hoye for Appellant.

Alfred Wright, Gordon Hall, Jr., and James P. Mackel for Respondents.

CRAIL, P. J.—This case has been transferred by the Supreme Court to this court for decision and is an appeal by the cross-complainant Clyde McMurray from a decree of the trial court denying all her claims.

The case arises out of a controversy between the mother, Clyde McMurray, and the wife and children of a decedent, and concerns two trusts created by him during his lifetime. The cross-complaint attacks the second trust wherein decedent made provision for his mother, wife and children, charging that she was induced by fraud, concealment and superinduced mistake to relinquish a contingent remainderman's interest in the original trust estate, which, however, could vest only upon the event of the death of her son prior to August 10, 1937, leaving her surviving him. She now repudiates the second trust and seeks to establish rights under the prior trust. Owing to the unexpected death of the son at the age of twenty-seven years it has become apparent that her contingent interest would have vested within the time prescribed and would have conferred upon her benefits of greater pecuniary value than those which she has received under the second trust agreement.

The cross-complaint, the primary object of which was to establish a constructive trust in the assets held by the Chase National Bank, as trustee, alleged that her son, his agents and attorneys, by means of false and fraudulent representations, coupled with promises made without any intention of performance, induced her to consent to the extinguishment of her contingent interest in the first trust, which for convenience is called the "Klingerman" trust, the assets of which were then placed by her son in the so-called "Chase" trust, which she now attacks; and that the acts alleged to have been committed by her son, his agents and attorneys, were in violation of duties which she claimed arose out of an alleged fiduciary relationship between the parties.

The cross-complainant makes the contention on this appeal that there is no substantial evidence to sustain certain findings of the trial court, but she says that "if this court can find *any support* in the record for the 'findings' of the lower court, that there was *no fiduciary relation* between the parties to the 'transaction' under consideration, . . . then we shall confess defeat and admit that this appeal is without merit".

Will McMurray and cross-complainant were husband and wife and Donald McMurray, who became the trustor of the two trusts, was their only child. In the year 1924 appellant divorced her husband, accepting $50,000 in settlement of her property rights. Not long after, in 1925, Will McMurray

died intestate, leaving Donald McMurray, cross-complainant's son, as his sole heir. The boy was then a minor aged eighteen years, and an irresponsible and inexperienced youth. Distribution of the estate was postponed until the boy reached the age of twenty-one, by which time appellant, who testified that she was very much concerned over the possibility of the boy's having so much money to spend, together with her cousin, the cross-defendant Ralph G. Klingerman, had persuaded him to create the so-called Klingerman trust with Klingerman as the trustee.

Discussions between the three continued for nearly a year prior to the boy's becoming of age, at which time he was taken to Wyoming by cross-complainant and Klingerman, where, on his twenty-first birthday, his father's estate was distributed to him. Cross-complainant and Klingerman had taken with them a trust agreement drafted by Klingerman's attorney, and on the same day caused him to sign it. By the terms of this trust, the trustee was to pay to the trustor the sum of $2,000 per month, utilizing, if necessary to make up such payments, a portion of the oil royalties, and was to pay the balance of the royalties to cross-complainant until she should have received in all the sum of $50,000. Thereafter, cross-complainant was to be paid one-half of the royalties. The trust was to terminate by lapse of time on August 10, 1932, and the *corpus* thereof was to be paid to Donald McMurray, if living, as his sole and separate property. In the event of his death prior to that time, the *corpus* was ultimately limited in succession to the wife and to the mother of the trustor.

Pursuant to the provisions of the trust, cross-complainant received large sums of money. Payments aggregating $50,000 were made to her, and she received the further sum of $36,000, which last sum she testified she kept as an emergency fund. In addition to these benefits, she had received $50,000 worth of Liberty bonds from her son at or about the time of the inception of the trust.

On May 16, 1928, they executed a supplement to the trust indenture whereby it was provided that the trust should continue for an additional five years, provided that in the event of the trustor's prior death the *corpus* of the trust estate was to be distributed and disposed of according to the provisions of the original indenture. It was further directed, how-

ever, that after the expiration of the original five-year period all payments to cross-complainant should cease.

After August 10, 1932, on or about which date cross-complainant received the last of the payments to which she was entitled under the Klingerman trust as supplemented, she received nothing whatsoever from the trust estate. From that date on her rights therein were limited to a contingent interest in the *corpus* which could vest only in the event of her son's death prior to August 10, 1937, leaving her surviving him, a possibility which, in view of their respective ages (Donald, 27 years, and appellant, 53 years), was exceedingly remote.

The condition of Donald McMurray's financial affairs at the time of his marriage to cross-defendant in 1932 was distressing. The revenues of the estate, whether from mismanagement or otherwise, had dwindled to a point where the trust, burdened as it was with an annual trustee's fee of $5,000, was unable to disburse to the trustor much more than 25 per cent of the minimum monthly payments provided for him. Abroad, with insufficient funds to pay his living expenses, he was continually calling on Klingerman for money, and although he knew cross-complainant to be short of funds, he even cabled in an effort (which proved fruitless) to secure financial assistance from her.

In February, 1936, Myron Reynolds, the father-in-law of Donald McMurray, came to Los Angeles, at the latter's request, to investigate and to see what could be done to unravel the tangle of Donald's affairs. He dealt chiefly with Klingerman and Klingerman's attorney, but in the course of his investigation he consulted with cross-complainant, and secured from her copies of certain of the trustee's reports. From the outset, he told her that it was Donald's wish and his own purpose to have the assets of the estate returned to Donald, free and clear of any trust, and in this she acquiesced. Klingerman likewise informed cross-complainant of his intention to resign and warned her that she would have to look out for her own interests.

Accordingly, Klingerman, who insisted that the matter be judicially determined filed a complaint as trustee in which he, having tendered his resignation, prayed that it be accepted and asked for the instructions of the court. Donald

McMurray and all persons then in being who had an interest in the trust, vested or contingent, were joined as defendants.

Albert Parker, a lawyer who had been retained by Myron Reynolds, explained to cross-complainant in full detail that the proceeding contemplated the extinguishment of her contingent interest in the trust, and that thereafter she would have to rely for financial assistance upon her son's generosity.

The same statements were made in a letter sent by Parker to her for signature, the import of which was fully explained to her by Myron Reynolds, as well as by Parker.

As a matter of convenience, she, as the only party defendant then present, was asked to verify the answer, which she did.

The case came on for hearing, and judgment was entered, accepting Klingerman's resignation and ordering a transfer of the assets to Donald McMurray on the theory that the trust had terminated upon Klingerman's resignation.

Before his departure, and at her request, Myron Reynolds undertook to procure certain temporary funds for cross-complainant from Donald, and agreed to use his best efforts to have Donald provide for the payment to her of a regular income in the sum of $200 per month.

Finally, after protracted negotiations between The Chase National Bank and its attorneys and Donald McMurray and his attorneys in France, the Chase trust was created. It provided for cross-complainant, and she received from it monthly payments of $200 during the joint lives of Donald and herself, and it further provided for the payment of premiums on life insurance in the sum of $40,000 on Donald's life, of which insurance she was beneficiary.

Before the trust was finally set up, cross-complainant, always in need of funds, wrote to Oliver Reynolds, the brother of Myron Reynolds and an attorney in New York, who represented The Chase National Bank in this matter, stating that her financial difficulties had multiplied "during the months the trust was being changed", and asking when she might "expect the monthly payments" under the new trust. He replied that payments would be forthcoming immediately, and she did thereafter receive from the trust, in monthly instalments of $200 each, the sum of $1800. Upon Donald's death, which terminated the monthly payments, she received $38,000 as the proceeds of the insurance policy, the premiums

on which were paid by the trustee pursuant to the terms of the trust indenture.

Notwithstanding these benefits received and her willing acquiescence in the provisions voluntarily made for her by her son, she now casts an eye at the interest to which she might have become entitled under the former trust. This interest, which in 1933 appeared so remote as to be negligible, has subsequently become of substantial value owing to the happening of an event which none of the parties contemplated as within the realm of possibility.

Upon the foregoing facts the trial court made voluminous findings of fact and conclusions of law and entered its decree adverse to each and all of cross-complainant's contentions. It is from this judgment the cross-complainant appeals.

■ The mere existence of the relationship of parent and child did not alone give rise to a fiduciary relation. · (*Smith* v. *Mason,* 122 Cal. 426 [55 Pac. 143] ; *Best* v. *Paul,* 101 Cal. App. 497 [281 Pac. 1089] ; *Broaddus* v. *James,* 13 Cal. App. 464, 472 [110 Pac. 158].) The relation of mother and son is merely one of several circumstances, which taken together may or may not warrant a finding that a fiduciary relation existed. (*Lynch* v. *Lynch,* 207 Cal. 582 [279 Pac. 653].)

Donald McMurray occupied no position of superiority with relation to the cross-complainant. On the contrary, the record shows that she dominated him to a large extent. The original Klingerman trust, which she now seeks to reestablish, owed its creation in the beginning to her own persuasions.

Negativing cross-complainant's claim that she reposed trust and confidence in her son, the record shows that she mistrusted him. He had never worked and was wholly inexperienced and irresponsible. She, on the other hand, had considerable business experience in the handling and investment of sums of money in excess of $150,000. From time to time since her husband's death, she dealt in real estate, mortgages, stocks and bonds, and she had various transactions with lawyers, brokers, bankers and business men with relation to her not inconsiderable business affairs.

A fair inference that can be drawn from the record is that she occupied the dominating position and whatever her natural feeling of affection for him may have been, she placed no reliance whatsoever in his judgment. Her position of actual superiority was such and her distrust of him was so

plainly demonstrated by her own testimony that the court might well find, as it did, that, as to his mother, Donald occupied no position of a fiduciary character despite the blood relationship.

Contending further that the evidence shows without conflict that there was a fiduciary relationship between the mother on the one hand and the son and his attorneys and agents on the other, she contends that Myron Reynolds constituted himself a trustee for the cross-complainant on the theory that Reynolds solicited her confidence and cooperation and thereby induced her to embark in the joint enterprise culminating in the termination of the first trust. The acts of Myron Reynolds fall far short of the voluntary assumption of a relation of confidence within the meaning of section 2219 of the Civil Code upon which appellant relies. The record discloses that he asked her for such information as she could give him concerning Klingerman's management of the estate and requested that she hand over to him copies of the trustee's reports. These reports belonged to Donald. At the request of Reynolds and Parker she verified the answer in the case of *Klingerman* v. *McMurray,* but this was in line with the program which she had agreed to before she decided to cooperate with the cross-defendants. Nothing further in the way of cooperation was asked of her and she volunteered nothing more. On this showing it cannot be held by this court on appeal that the evidence is without conflict that Myron Reynolds so solicited her trust and confidence that he voluntarily assumed the duties and disabilities of a trustee. (*Gosnell* v. *Lloyd,* 215 Cal. 244 [10 Pac. (2d) 45]; *Jackson* v. *Gorham,* 98 Cal. App. 112 [276 Pac. 391].)

Cross-complainant next contends that since Albert Parker appeared as attorney for her in the case of *Klingerman* v. *McMurray* the relation of attorney and client placed him under all the disabilities of a trustee as to her. This is elementary, but it is equally true that until the moment that the relationship of attorney and client was created the parties dealt at arm's length. (*Cooley* v. *Miller & Lux,* 156 Cal. 510, 524 [105 Pac. 981].) Albert Parker did not become appellant's attorney until March 1, 1933, on which day she returned to him the letter authorizing him to represent her. Prior to this time, it had been fully explained to her what was contemplated. Reynolds and, at his request, Parker

had fully disclosed the proposed course of action and her position was explained to her in the plainest of terms. She was informed that her contingent interest in the trust would be completely extinguished and that for further support she must look to her son's generosity.

With full understanding of the facts cross-complainant signified her acquiescence in what was done, and with her mind fully made up authorized Parker to represent her as one of the codefendants in the pending action. There was a straightforward course of dealings evidenced in the record. Before the relation of attorney and client arose Parker told cross-complainant that her contingent interest would be extinguished and that such a result would leave her without any interest whatsoever other than such as might subsequently result from her son's voluntary desire to provide for her support, and he accepted employment as her attorney only after she clearly understood what her position would be.

At the time of the filing of the action of *Klingerman* v. *McMurray* cross-complainant's interest was of small pecuniary value. She had received large sums from the trust, but all payments had ceased for some time under its terms and provisions. She was then receiving nothing and her sole claim was an interest in the *corpus* upon a double contingency, namely that her son might die prior to August 10, 1937, and that upon the happening of such an event she would survive him.

It is apparent from what we have said that this court finds support in the record for the findings of the lower court that there was no fiduciary relation between the parties to the transaction under consideration and, taking the cross-complainant at her word, we shall not discuss her minor contentions, although we find that there is no merit in them.

■ Finally, the cross-complainant files a supplemental appellant's brief in which she contends that, ''The decree (*Klingerman* v. *McMurray et al.*, No. 354,527) purporting to terminate the 'Klingerman Trust' is absolutely void, in that the Superior Court that rendered it had no jurisdiction of the subject-matter thereof; said trust being 'private' and not 'testamentary' in character, and it affirmatively appearing on the face of the record of said suit that no 'actual controversy' between the parties to said suit, or other grounds of declarative relief existed, or was alleged.''

We will briefly summarize the allegations of the complaint in that action. The trust indenture was pleaded *in haec verba* and the interests of the several beneficiaries were set forth. In paragraph VI, it is alleged that there has been great dissatisfaction expressed by the defendants with the plaintiff's administration of the trust; that they have threatened to have plaintiff removed or the trust declared void; and that efforts have been made to obtain his resignation. Plaintiff then alleges his willingness either to continue if undisturbed or to resign if reasonable compensation be paid him as trustee's fees, averring that $2,850 would reasonably compensate him. He then tenders his resignation as trustee to take effect upon the making of an order accepting the same, settling his account, and authorizing payment of his alleged compensation out of the trust estate. In paragraph VII, it is alleged that as the trust instrument makes no provision for the appointment of a successor, it is necessary for the plaintiff to apply to the court to designate another trustee. Plaintiff then alleges that he is in doubt as to his duties upon his resignation with respect to the disposition of the *corpus* of the trust estate because defendants contend that under the provisions of the trust indenture the trust shall terminate upon his resignation. He then alleges that because of the insistence of the defendants upon the foregoing contention, he is in doubt as to whether the *corpus* shall be returned to the trustor or delivered to a successor trustee. He, therefore, seeks the instructions of the court. In conclusion, plaintiff prays for a decree accepting his resignation and settling his accounts, construing the trust indenture, determining whether the trust terminates upon the resignation of the trustee or whether a substitute trustee should be appointed, ordering the proper disposition of the *corpus* of the trust estate and making provision for the payment of the trustee's fees and income taxes.

The attack made by appellant on the decree is a collateral attack and unless it affirmatively appears on the face of the judgment roll that the court lacked jurisdiction of the subject matter, her attack must fail. That the superior court had jurisdiction of the subject-matter under circumstances very similar to those herein has been held in numerous cases. (*In re Bauer,* 17 Cal. App. (2d) 426 [62 Pac. (2d) 150]; *Cauhape* v. *Barnes,* 135 Cal. 107 [67 Pac. 55]; *In re Beisel's*

*Estate,* 110 Cal. 267 [40 Pac. 961, 42 Pac. 819]; *Security-First Nat. Bank* v. *J. D. Millar Realty Co.,* 217 Cal. 277 [18 Pac. (2d) 339]; *Curtin* v. *Krohn,* 4 Cal. App. 131, 136 [87 Pac. 243].)

Judgment affirmed.

Wood, J., and McComb, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 21, 1938.